# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **STEPHEN G. STATLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:07CV1693MLM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue ("Defendant") denying the application of Stephen G. Statler ("Plaintiff") for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et seq. Plaintiff filed a brief in support of the Complaint. Doc. 15. Defendant filed a brief in support of the Answer. Doc. 18. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). Doc. 7.

## I.
## PROCEDURAL HISTORY

Plaintiff applied for disability benefits on March 11, 2004. Tr. 9, 67-69. On June 9, 2004, Defendant approved Plaintiff's application and awarded him disability benefits with a disability onset date of May 13, 2003. Tr. 9.

On January 10, 2006, pursuant to a Continuing Disability Review, it was determined that Plaintiff's medical condition had improved and that Plaintiff was no longer disabled as of January 1, 2006. Tr. 9. Plaintiff requested and received a hearing before a Disability Hearing Officer, who rendered a decision unfavorable to Plaintiff on March 22, 2006. Tr. 9.

On March 28, 2006, Plaintiff requested review by an Administrative Law Judge ("ALJ"). Tr. 9. A hearing was held before ALJ Randolph E. Schum on December 21, 2006. Tr. 9, 18-40. The ALJ issued an opinion on January 25, 2007, in which he determined that Plaintiff was no longer disabled as of January 1, 2006. Tr. 6-17. Plaintiff filed a request for review by the Appeals Council, which the Appeals Council denied on September 7, 2007. Tr. 2-5. The decision of the ALJ, therefore, stands as the final decision of the Commissioner.

## II.
## TESTIMONY BEFORE THE ALJ

**A.** **Plaintiff's Testimony.**

Plaintiff testified at the hearing that he was forty-seven years old; that he graduated high school; and that he has not received any formal education after high school. Tr. 20.

Plaintiff testified that he experienced pain in his neck, shoulders, and lower back; that the pain in his lower back occurred "a little above" his belt level and was not constant; that this pain comes and goes; that Dr. Doyle, his family doctor, told Plaintiff that the lower back pain was related to Plaintiff's neck injury; that he sometimes cannot get out of bed due to pain in his lower back; that he experiences burning sensations down through his shoulders when he turns his neck too far; and that at the hearing he could not move his neck when responding to questioning by his attorney because it hurt to move his head. Tr. 26, 34.

Plaintiff also testified that he was dizzy "[a]ll the time"; that this dizziness resulted from medication and began about five or six months prior to the hearing; and that he had a loss of appetite. Plaintiff stated that he had started taking two new medications, prescribed by Dr. Doyle, in the two weeks prior to the hearing; that these new medications were to help him sleep because past

medications had caused allergic reactions which prevented him from sleeping; that the new medications helped him sleep; that they did not help the pain; that usually he can go to sleep within an hour of taking his new medication and can sleep through pain; that he takes his new medication once every eight hours and also takes four other pills once a day; that the pill he takes every eight hours makes him tired and dizzy; that after taking the medication he can sleep for four or five hours before waking; and that prior to taking this medication, he was not sleeping much. Tr. 22-27, 29-30.

Plaintiff stated that Dr. Coyle,[1] a specialist, told him in 2004 that he could return to work as long as he did not do any overhead work or lifting above his shoulders; that he had been through work hardening; that the last time he went to work hardening he "ended up going to the hospital [because he] was in so much pain"; that, other than the pain and the dizziness, he has no problems which would keep him from working full-time; and that he cannot find a job because of his limitations and medications. Plaintiff further stated that he "was released from Worker's Comp with [ ] permanent restrictions" and that when he "went [ ] to try to get [his] job back, they terminated [him] because of all the limitations and the restrictions and the medication that [he was] on." Tr. 21. Plaintiff further stated that he had a pending workers' compensation claim relating to an injury received on May 13, 2003. Tr. 21-28, 32.

Plaintiff testified that he was seeing Dr. Doyle for depression; that his symptoms of depression include his not feeling like doing anything and feeling worthless; that Dr. Doyle tried to get him in to see a neurologist; and that no one would see him because of his two prior surgeries and because he is on Medicare. Tr. 24, 27-28,

Plaintiff testified that he doubts that he can sit for a job for eight hours a day; that he can

---

[1]        Note that Plaintiff's doctors include Dr. Doyle and Dr. Coyle.

usually sit for thirty to forty-five minutes before he needs to get up and move around; that if he does not move, his pain becomes worse; that at the time of the hearing the pain in his neck and lower back were about five on a scale of one to ten; that he can stand for about thirty to forty-five minutes before he has to sit down or move around; and that, after thirty to forty five minutes, his neck stiffens and tightens, his back starts hurting, and he becomes dizzy. Tr. 32.

Plaintiff also testified that he loves to hunt; that he used to hunt "all the time"; that he had only hunted two or three times the year of the hearing because of pain and dizziness; that in 2006 he hunted twice in archery season and once in rifle season; that he did not clean or dress the animals; that he could not use a regular bow because he could not pull it back because of the weight; that "[a] cross-bow is a device that you don't have to pull back to archery hunt with"; that he could and did hunt with a rifle; that the rifle hurt when it kicked; that Dr. Coyle[2] was initially against issuing him a cross-bow permit; and that Dr. Coyle relented because Plaintiff explained to Dr. Coyle that he had nothing left to enjoy in life. Tr. 30-31.

Plaintiff stated that he did not do any household chores; that he did them before he was injured; that his wife and son now do the household chores; that he had tried to mow the lawn the previous year and ended up spending two and a half days in bed; that he does not read and did not read much before his injury; that he has a couple friends who visit once in a while; that he does not

---

[2]      The transcript reflects that Plaintiff testified that Dr. Doyle issued him the permit. The record reflects, however, that it was Dr. Coyle who issued him the crossbow permit. Tr. 565. Likewise, the ALJ erroneously stated that Dr. Doyle issued Plaintiff the permit. An "arguable deficiency in opinion-writing technique," however, does not require a court to set aside an administrative finding when that deficiency had no bearing on the outcome. See Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Carlson v. Chater, 74 F.3d 869, 871 (8th Cir. 1996); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). The ALJ's misstatement as to which of Plaintiff's doctors issued the cross bow permit does not affect the outcome of this case.

"go very many places at all"; that he left the house twice in the two weeks prior to the hearing; that because the new medication makes him dizzy he does not drive; that his wife drove him to the hearing; that he drives very seldom; that he drove more before he started taking the new medication; that he has problems turning his neck when driving; and that on his good days, he sits, watches television, and drinks soda.  Tr. 26, 31-34.

**B.**     **Testimony of Vocational Expert.**

Vocational Expert ("VE") Brenda Young testified at the hearing and acknowledged that Plaintiff's past work was primarily as a welder, which position is classified as a laborer. The ALJ presented VE Young with three hypothetical claimants, each with varying degrees of physical abilities and limitations and asked VE Young what work, if any, each hypothetical claimant could perform in the regional and national job forces.

The first hypothetical is forty-seven years old, has a high school education, has the same work experience as Plaintiff, can lift and carry up to twenty pounds occasionally and ten pounds frequently, can stand for six hours out of eight, stand or walk from six hours out of eight, can engage in no repetitive overhead reaching, and can have no concentrated exposure to vibration.  VE Young testified that this first hypothetical claimant can return to the past position of combined punch press operator/welder.  Plaintiff stated that he had worked as a punch press operator for three or four months about fifteen years prior to the hearing. Tr. 35-36. VE Young testified that the first hypothetical claimant can perform no other past work.  VE Young also testified that the first hypothetical person can perform light assembly work, with approximately 15,000 such jobs in the metropolitan St. Louis area, and some machine operator positions, with approximately 3,000 such jobs in the metropolitan St. Louis area. VE Young testified that the national figures would be

approximately forty times those of the state. Tr. 36-37.

The second hypothetical claimant is 47 years old, has a high school education, can lift and carry up to ten pounds occasionally and less than ten pounds frequently, can stand for six hours out of eight, can stand or walk six hours out of eight, can engage in no overhead reaching or lifting. VE Young testified that this second hypothetical person can not return to any past work position of Plaintiff's. VE Young further testified that the second hypothetical claimant can perform some sedentary work, such as sedentary assembly-bench work, of which there are approximately 2,500 such jobs in the metropolitan St. Louis area and sedentary cashier-type jobs, of which there are approximately 800 jobs in metropolitan St. Louis. Tr. 37.

The third hypothetical claimant is forty-seven years old, has a high school education, can lift and carry up to ten pounds occasionally, can sit for less than two hours out of eight, can stand or walk for less than two hours out of eight, can never climb stairs or ramps, ropes, ladders or scaffolds, and can not stoop, crouch or reach in any direction. Further, in regard to reaching overhead, handling, gross manipulation and fingering, fine manipulation, the third hypothetical claimant is limited to thirty percent of work time bilaterally. VE Young testified that the third hypothetical person can not return to any past work of Plaintiff's and there is no work in the regional, state or national economy which this person could perform. Tr. 38.

VE Young testified that her testimony was consistent with the "DOT" and the "Selected Characteristics of Occupations" "with the exception that the sedentary assembly and cashier jobs are included in the light work category but [ ] do exist in smaller numbers in the sedentary category." Tr. 38.

# III.
# MEDICAL RECORDS

Records from Regional Primary Care, dated May 14, 2003, state that Plaintiff suffered a work-related injury the day before, May, 13, 2003, when his drill broke, jerking his left wrist and shoulder forward; that Plaintiff said his first three fingers on his left hand were numb and that when he touched the top of his hand, pain would shoot up his arm; that physical examination revealed left-sided weakness with scapula elevation, limited neck range of motion including flexion, extension and lateral rotation, and limited hyperextension due to pain; that adduction with external rotation caused increased pain; that the plan for the Plaintiff was to undergo physical therapy three times a week for two weeks; that Plaintiff was prescribed Skelaxin, Ultraset and Celebrex; and that Plaintiff had smoked one and a half packs of cigarettes a day for the preceding ten years. Tr. 265.

Medical records reflect that Plaintiff presented at Regional Primary Care on May 28, 2003, and was examined by Brent Voszler, M.D. Records of this date state that Plaintiff had a very stiff neck, a tender upper anterior chest wall, a tender left infraspinatus; that his reflexes and strength in his upper arms were normal; that Plaintiff had undergone physical therapy for two weeks; that there had been no improvement with physical therapy; that the assessment was that Plaintiff had a C-Spine spasm; and that Plaintiff was to continue taking Skelaxin, start on Prednisone, and have an MRI. Tr. 264.

Medical records reflect that Plaintiff presented at Regional Primary Care on June 4, 2003, complaining of pain. Records of this date reflect that Plaintiff underwent an MRI; that the MRI revealed foraminal stenosis; that Plaintiff was on Skelaxin, Prednisone, and Vicodin; and that it was recommended that Plaintiff get a neurosurgical opinion. Tr. 263.

In a letter dated June 19, 2003, addressed to Liberty Mutual, David R. Lange, M.D., stated that he saw Plaintiff for an independent spine evaluation. Dr. Lange reported in this letter that Plaintiff complained of severe pain from the neck into the left scapula and shoulder region and of discomfort passing into the chest and the lateral arm down to the elbow and "somewhat into the forearm." Dr. Lange further reported in the June 19, 2003 letter that he believed Plaintiff had a carpal tunnel problem on the left because he would wake up with numbness in his left fingers and a burning sensation; that Plaintiff had "some tenderness over the left trapezius to relatively light to the touch above and beyond what one would typically expect"; that previous radiographs reflect a degenerative disc at C5-6; that an MRI showed degenerative changes without significant nerve root compression; that, absent other trauma, it was reasonable to assume a causal connection between Plaintiff's work injuries and his symptoms; that Plaintiff had not reached maximum medical improvement; and that it was "probably reasonable for him to be off work." Tr. 162-64.

In a July 8, 2003 letter to Liberty Mutual, Dr. Lange stated that he deemed surgery for Plaintiff reasonable; that Plaintiff still had significant pain passing from the neck into the trapezius area and into the arm down to the elbow and anterior chest discomfort on the left; that Plaintiff's symptoms worsened with extension of the neck when tilting or rotating to the left; that he advised Plaintiff to avoid invasive treatment if he is improving at all; that Plaintiff responded that he was getting worse not better; that Dr. Lange then discussed the surgical options with Plaintiff; and that Plaintiff would like to proceed with surgery. Tr. 161.

Plaintiff's medical records reflect he was admitted to DePaul Health Center in Bridgeton on July 16, 2003, and that Dr. Lange performed a C6-7 diskectomy, an anterior fusion of C6-7, placement of structural allograft at C6-7, placement of anterior Zenith plate at C6-7, and inspection

of the C5-6 disk. The records further reflect that Dr. Lange performed a superficial inspection of the C5-6 disk. Record further reflect that "[t]o palpitation, actually it was relatively flat with only minimal anterior spurs. With pressure above and below, there appeared to be no unusual movement. Basically, it was felt it would be best to not treat this level surgically." Tr. 140-43.

In an August 28, 2003 letter to Liberty Mutual, Dr. Lange stated that Plaintiff still had "aching in his neck and trapezius area as expected"; that Dr. Lange informed Plaintiff that the healing of the fusion begins "approximately six weeks after surgery and then hopefully is complete by 12 weeks"; and that Dr. Lange also told Plaintiff to gradually increase his activities at home over the next couple of weeks and that, in three weeks, he should be ready for a rehabilitation program. Tr. 157

In a letter dated September 18, 2003, Dr. Lange informed Liberty Mutual that Plaintiff had no upper extremity pain; that Plaintiff still had a burning sensation around the neck; that Plaintiff "appeared in no acute distress at all"; and that Plaintiff would be starting a rehabilitation program. Tr. 156

In an October 9, 2003 letter to Liberty Mutual, Dr. Lange stated that Plaintiff came to his office and was complaining that his physical therapy had brought on a "fair amount of aching across the neck and into the shoulder." Tr. 155

In a letter dated November 6, 2003, Dr. Lange stated that Plaintiff claimed he was no better than before and that Dr. Lange discontinued Plaintiff's physical therapy. Tr. 154.

In a letter dated December 4, 2003, Dr. Lange stated that Plaintiff reported he was no better; that the x-rays showed a "more favorable situation as compared to the past"; that Plaintiff was healing better than he had been; and that Dr. Lange determined that physical therapy should be started again. Tr. 152

On December 8, 2003, Physical Therapist Cherie Prenger reported that Plaintiff had pain, decreased range of motion, and impaired posture; that Plaintiff's rehabilitation potential was good; and that she was recommending that he attend physical therapy sessions three times a week for three to four weeks. Tr. 215.

Medical records reflect that Plaintiff attended physical therapy sessions nine times between December 8, 2003, and December 26, 2003. Tr. 216-219.

In a letter dated January 5, 2004, to Liberty Mutual Dr. Lange stated that Plaintiff presented stating that "he is no better at all"; that x-rays showed "negligible movement with lateral flexion extension"; that Dr. Lange recommended Plaintiff have a CT scan with reconstruction views; that if the CT scan showed an established nonunion, further surgical options could be considered; and that Dr. Lange recommended that Plaintiff remain off work. Tr. 151.

Wallace M. Anderson, M.D., reported that a January 7, 2004 CT scan showed that there were no significant abnormalities at the C2-C3, C4-C5, C7-T1, and T1-T2 levels; that there was disc narrowing at C5-C6; that there were changes of anterior bony and plate and screw fusion at C6-C7; and that the impression from the scan was that there were postoperative changes at C6-C7, and changes of degenerative disc disease at C5-C6, and right maxillary sinusitis. Tr. 165.

In a letter to Plaintiff dated January 13, 2004, Dr. Lange stated that he had viewed the results of the CT scan; that the CT scan showed "no problem with the plate or screws"; that while the bone graft was still present, it was "not solidly healed to the adjacent vertebrae"; that Plaintiff could either pursue a second surgery or give the situation more time; that Dr. Lange recommended taking the latter option; that Dr. Lange suggested that Plaintiff "hold off on further physical therapy"; and that Dr. Lange told Plaintiff to continue to see him every six weeks and remain off work. Tr. 150.

Records of Southeast Missouri Hospital Emergency Room reflect that Plaintiff presented on January 19, 2004, complaining of a headache, back pain, and nausea; that Plaintiff was experiencing pain in the "left flank area and kind of around to the left lateral lower chest area"; that Plaintiff said this pain started approximately one and a half weeks prior; that Plaintiff believed that physical therapy had triggered the pain; that Plaintiff also reported that two to three days earlier he had experienced pain in the left chest when breathing; that examination showed that there was "little bit limited motion" in the neck and "no nuchal rigidity appreciated"; that Plaintiff received Demerol and Compazine, after which he "had significant improvement and [was] feeling much better"; that it was likely that Plaintiff strained himself during physical therapy; that Plaintiff was advised to limit activity and continue taking Darvocet; and that Plaintiff was prescribed Flexeril, as needed for soreness, and Ibuprofen, as needed for pain. Tr. 132-33.

In a letter to Liberty Mutual dated February 12, 2004, Dr. Lange reported that Plaintiff said that there had "been no real change"; that x-rays showed "no unusual screw problems," no definite movement on lateral flexion extension views," and "a very thin lucency on both the upper and lower aspect of the graft"; that Plaintiff "appeared to guard the neck much less than previously"; that there was "likely .. a persistent lack of healing of the fusion"; that the options included waiting it out or obtaining a second opinion; and that Plaintiff should remain off work. Tr. 149.

In a letter to Liberty Mutual dated March 10, 2004, James J. Coyle, M.D., stated that he saw Plaintiff for a second opinion regarding Plaintiff's cervical fusion; that Plaintiff had left-sided supraspinatus tenderness and paracervical tenderness and pain upon hyperextension of his neck; that Dr. Coyle's impression was that Plaintiff had pseudoarthrosis C6-7 status post anterior cervical diskectomy and fusion; that Dr. Coyle recommended undergoing a second surgery, noting that the

options included anterior and posterior fusion, and anterior interbody fusion alone; that it was "absolutely imperative that [Plaintiff] completely cease smoking and refrain from smoking at least a month before revision surgery"; that he did not think that Plaintiff's "pseudoarthrosis [was] a failure of surgery"; and that Plaintiff's pseudoarthrosis was a "biological failure due to cigarette smoking." Tr. 176-77.

In a letter to Liberty Mutual dated April 1, 2004, Dr. Lange stated that he had reviewed a note from Dr. Coyle regarding Plaintiff; that Dr. Coyle did not mention the option of further observation; that "most anterior cervical fusions are healed within three months"; and that "in some individuals, particularly with nicotine exposure there can be extremely delayed healing or overt nonunion." Dr. Lange recommended that Plaintiff should "not have more surgery" and opined that "likely [Plaintiff] [had] reached maximum medical improvement" and that there were no "guarantees" as to whether "the fusion would heal even if [Plaintiff] stop[ped] smoking." Tr. 148.

Dr. Coyle's records reflect that Plaintiff presented on April 19, 2004, complaining of neck pain, left shoulder blade pain, and pain all through his left arm down to his fingers. Upon review of Plaintiff's "study," Dr. Coyle stated that Plaintiff had clear pseudoarthrosis above and below his bone graft and significant spondylitic changes at C5-6. Dr. Coyle reported that Plaintiff had completely ceased smoking earlier in the month; that Plaintiff wanted to undergo a second surgery; and that Dr. Coyle scheduled Plaintiff for anterior revision decompression C6-7 and extension of his fusion to C5-6. Tr. 576A.

Medical records reflect Dr. Coyle performed surgery on Plaintiff on April 26, 2004. Dr. Coyle reported that there were no perioperative complications; that the day after surgery Plaintiff noted decreased upper left extremity pain; and that Dr. Coyle instructed Plaintiff to wear his collar at all

times, to refrain from smoking and driving, and return in two weeks. Tr. 631-39.

Dr. Coyle's records reflect that Plaintiff presented for a post-operative evaluation on May 5, 2004. Dr. Coyle's records of this date state that Plaintiff reported that his arm was feeling better and that he had some "residual tingling in the tips of his fingers on the left"; that Plaintiff's incisions were "healing nicely"; that Plaintiff's x-rays "look[ed] very good"; that Plaintiff was "still completely cigarette free"; that he was "doing well"; and that Dr. Coyle instructed Plaintiff to follow up in four weeks, wear a collar at all times, and not drive or work. Tr. 128.

Dr. Coyle's notes of May 24, 2004, state that Plaintiff presented for an unscheduled visit; that Plaintiff complained of neck, occipital, shoulder, bone graft site, and left leg pain; that Plaintiff had been seen in the emergency room the week before complaining of headaches; that his x-rays looked "very good"; and that Plaintiff was "not capable of driving or working at the present time." Tr. 573.

In a letter dated June 15, 2004, Dr. Coyle stated that Plaintiff continued to complain of neck and shoulder pain; that Plaintiff's x-rays looked "very good"; that Dr. Coyle decreased Plaintiff's medication to Darvocet; that Plaintiff was to continue limiting his activity; and that if he was not taking Darvocet, Plaintiff could drive. Tr. 570.

John Graham, M.D., reported in a June 21, 2004 letter to Dr. Coyle that he saw Plaintiff pursuant to a referral from Dr. Coyle; that "all and all, [Plaintiff was] doing quite well"; that Plaintiff was not wearing his collar; that Plaintiff complained of trouble sleeping; and that examination showed "mild tightness in the paraspinous muscles of the neck, though all and all the traps and upper back are quite good and do not show the tightness that [he] would typically expect to see." Dr. Graham recommended continuing Plaintiff on Darvocet, as well as prescribing Bextra, Trazodone to help with sleep, and Lexapro in the morning. Tr. 590-93.

In a letter dated July 12, 2004, to Dr. Coyle, Dr. Graham stated that Plaintiff had returned on this date; that "overall he [was] doing better"; that Plaintiff reported that the pain was "about the same"; that Plaintiff reported that he was sleeping much better and that his mood was "overall better"; that Plaintiff's wife said that Plaintiff was not "as moody and snappy as he was previously"; that "[a]ll and all" Dr. Graham was "happy"; and that Dr. Graham thought that Plaintiff's "neck pain [would] lessen once he is safely able to be started in physical therapy." Tr. 589.

Dr. Coyle reported that Plaintiff was seen on July 27, 2004, for follow-up. Dr. Coyle's records of this date state that Plaintiff complained of pain and reported that he was sleeping better than he had been at the time of his last appointment; that on examination Plaintiff's incisions were healing well; that Plaintiff had good strength in both extremities; that Plaintiff had "some residual tingling in his left hand and in the tips of the index, long, and ring finger; that Plaintiff should do no lifting greater than ten pounds, no repetitive bending, twisting, or climbing, and no work above shoulder height; and that Plaintiff should return in six weeks and continue to use a bone stimulator. Tr. 568.

In a letter to Dr. Coyle dated August 9, 2004, Dr. Graham related that he had seen Plaintiff; that Plaintiff complained that his medications caused an itching sensation under the skin and stomach problems; and that Dr. Graham discontinued Plaintiff's medications and prescribed Ultracet in place of Darvocet. Tr. 587.

Medical records reflect that Plaintiff presented at the Southeast Missouri Hospital Emergency Room on August 12, 2004, complaining of difficulty breathing after he took Ultracet. Upon examination Cynthia Bleichroth, M.D., reported that Plaintiff was breathing very rapidly and that his chest expansion was maximized when he breathed; that her impression was that Plaintiff had an

adverse reaction to Ultracet and hyperventiliation syndrome; and that she recommended that Plaintiff stop taking Ultracet, take Benadryl for the next twelve hours, and follow up with Dr. Graham. Tr. 604-606.

Dr. Coyle reported that he saw Plaintiff on September 7, 2004, for follow-up; that Plaintiff complained of pain in his neck and shoulder; that Dr. Coyle recommended that Plaintiff undergo a nerve conduction study to determine whether there was nerve impingement or chronic radiculopathy; and that Dr. Coyle gave Plaintiff a six month crossbow permit. Tr. 565.

In a letter dated September 13, 2004, Dr. Graham informed Dr. Coyle that he saw Plaintiff on this date; that Plaintiff complained of continued pain in his neck; that Plaintiff was "holding his head exceptionally stiff and still"; that Dr. Graham believed that instructions from Dr. Coyle's office for Plaintiff not to not to move his head or neck in any direction was a "somewhat unusual"; that Plaintiff did "not apparently tolerate anti-inflammatories"; that Dr. Graham continued Plaintiff on Darvocet until his nerve conduction study; and that if the nerve conduction study proved unremarkable, Plaintiff would be weaned from Darvocet and placed on Tylenol. Tr. 584-85.

In a September 29, 2004 letter to Dr. Coyle, Russell Cantrell, M.D., stated that he saw Plaintiff "for purposes of evaluating and treating his complaints of neck pain and left upper extremity paresthesias"; that Dr. Cantrell recommended a follow-up CT scan of the cervical spine and an increased dosage of Amitriptyline to improve sleep; that Plaitniff would remain on the restrictions, "namely lifting less than 10 pounds above shoulder level, no overhead work, and no turning or twisting of his head"; that he would "like to clarify whether the avoidance of twisting and turning of the head is a specific restriction or whether it is a self-imposed restriction"; and that Plaintiff said that Dr. Graham told Plaintiff that Plaintiff "was in it only for the money." Tr. 552

Records of Cape Imaging reflect that on October 4, 2004, Plaintiff underwent a CT scan at Cape Imaging upon referral from Dr. Cantrell; that the scan showed normal vertebral alignment at all levels and "degenerative changes at all levels commensurate with age including mild disc space narrowing and mild osteophyte and facet disease"; that the scan also showed minimal left-sided neural foraminal narrowing; and that the impression from the CT scan was that there was previous anterior cervical fusion at C5-C7 and mild diffuse degenerative changes, especially on the left at C5-6 and C6-7. Tr. 549.

An October 18, 2004 report completed by Dr. Cantrell reflects that Plaintiff had an EMG on this date. Dr. Cantrell reported that the EMG showed "no electrodiagnostic evidence of acute or chronic cervical radiculopathy or brachial plexopathy"; that "incidental note [was] made of prolongation of the distal latencies of the median and radial sensory nerves to the thumb and prolongation of the median and ulnar sensory nerves to the third and fifth fingers, respectively"; and that there was "both absolute and relative prolongation of the median motor nerve." Tr. 544-45.

In a letter to Dr. Coyle dated October 18, 2004, Dr. Cantrell reported that an EMG study "revealed evidence to suggest a median neuropathy at the wrist; that the median neuropathy in Plaintiff's left wrist appeared not to be caused by Plaintiff's May 2003 work injury; that the injury may explain some of the symptoms of which Plaintiff complained in his left hand; that Dr. Coyle recommended that Plaintiff begin a course of physical therapy for three weeks; that Plaintiff was given prescriptions for Darvocet and Mobic; and that Plaintiff would "be maintained on his current restrictions." Tr. 542.

Medical records reflect that Plaintiff attended a total of twenty-three physical therapy sessions at Mid America Rehab between October 19, 2004, and December 20, 2004. Tr. 494-530.

In a letter dated November 1, 2004, to Liberty Mutual Dr. Coyle reported that he had seen Plaintiff for a follow up six months after his surgery; that Plaintiff had a solid fusion from C5 through C7; that Plaintiff was currently taking Darvocet and Mobic; that Plaintiff's chief complaint was continued neck pain; that Plaintiff had no complaints of numbness or weakness; that the October 2004 EMG showed "no electrodiagnostic evidence of acute or chronic cervical radiculopathy or brachial plexopathy in the myotomes tested"; that "[t]he conclusion" from the EMG was "normal"; that a CT scan showed that Plaintiff's fusion was "solid"; that Plaintiff had "excellent grip strength, biceps strength, triceps strength, [and] intact sensation in both upper extremities"; that Plaintiff had "about 40% limitation in rotation and lateral bending, primarily due to symptoms of pain"; that Plaintiff had symptoms of myofascial pain; and that Plaintiff had achieved "maximum medical improvement from the standpoint of his cervical nonunion and cervical radiculopathy." Tr. 561-62.

Records reflect that Dr. Coyle authorized Plaintiff to return to work on November 2, 2004, with the restrictions that he not lift over ten pounds, perform no work above shoulder height, and continue his treatment with Dr. Cantrell. Tr. 563.

In a letter to Dr. Coyle dated November 15, 2004, Dr. Cantrell stated that Plaintiff presented that day complaining of increased neck pain following physical therapy session and that Dr. Cantrell recommended that Plaintiff do stretching exercises and that he use a "muscle stim unit" at home. Tr. 541.

Dr. Cantrell reported in a December 8, 2004 letter to Dr. Coyle that Plaintiff presented on that date "following participation in physical therapy"; that Plaintiff "indicated that he [was] not sleeping well" and that "the muscle stim unit" had "not altered his pain complaints substantially"; that Plaintiff reported that he continued to have pain with "flexion/extension greater than with side bending

movements"; that Dr. Cantrell recommended that Plaintiff cease using "the muscle stim unit," continue with physical therapy for two weeks, and then progress to a work conditioning program for two weeks; that Dr. Cantrell refilled Plaintiff's prescriptions of Mobic and Flexeril; and that Dr. Cantrell kept Plaintiff on his restrictions of lifting less than ten pounds above shoulder level and doing no overhead work. Tr. 540.

A Work-Hardening/Conditioning Re-Evaluation dated January 7, 2005, prepared by Mid America Rehab Plaintiff states that Plaintiff attended five work conditioning sessions. Physical Therapist Vic Zuccarello reported that Plaintiff could lift thirty pounds from the floor to his waist, thirty pounds from his waist to his shoulder, and twenty pounds from his shoulder to overhead; that Plaintiff could carry twenty pounds, push thirty-three pounds and pull forty-seven pounds; that Plaintiff was unrestricted in his ability to sit, stand, walk, bend and squat; that he could occasionally reach and climb; that his PDC level was medium; that Plaintiff had improved bilateral grip, cervical ROM, and "SH flexion strength"; that Plaintiff's "subjective reports [were] not consistent with function at [that] time"; that Plaintiff passed two out of six Symptom Magnification Indicators; that in regard to "Pain Level v. Behavior Function," Plaintiff's "pain level increased from 4-9/10 despite little change in function and improvements in musculoskeletal status" and he was able to drive to the session "despite 9/10 pain"; that in regard to "Perceived Disability Score," Plaintiff's "NDI score increased from 54% to 76% despite little change in functional ability"; that Plaintiff arrived with "posture of 45 degrees of neck flexion, but 15 minutes into test until completion his neck was in a neutral position"; that "despite 9/10 pain [Plaintiff] denied need for break during testing and performed all tasks with constant pace"; that [o]ccasional inappropriate laughter was observed"; that Plaintiff should follow up with Dr. Cantrell; and that Plaintiff did "not appear to be a further rehab

candidate." Tr. 461-62.

In a letter to Dr. Coyle dated January 10, 2005, Dr. Cantrell reported that Plaintiff presented after participation in a work hardening program; that Plaintiff stated that he had "persistent severe pain in his neck"; that Plaintiff stated that he could "'lift 100 pounds with one hand over [his] head', but he could not tolerate the pain complaints that have been persistent"; that the therapists noted that Plaintiff "ha[d] passed the majority of his validity criteria on their test results, but they ha[d] noted potential over-guarding in his neck range of motion and a score of 54% on the neck disability index, suggesting a high perceived disability"; that Plaintiff had "likely reached maximal medical improvement"; that Dr. Cantrell "suggested that [Plaintiff] return to work with a lifting restriction of less than 35 pounds and avoiding repetitive overhead activities"; that Plaintiff stated that "he anticipate[d] termination by his employer based on information conveyed to him by this employer"; and that no further follow up was being scheduled for Plaintiff. Tr. 535-36.

In a treatment note dated January 12, 2005, Edward Doyle, M.D., stated that Plaintiff had mild dull neck pain, decreased range of motion, and that was in mild to moderate distress. Tr. 436.

In a treatment note dated March 16, 2005, Dr. Doyle noted that Plaintiff was seen for follow up for neck pain; that Plaintiff had "some improvement" with medications; that Plaintiff's symptoms were mild; that Plaintiff had improved with therapy; and that Plaintiff had limited ROM. Tr. 432-33.

In a treatment note dated May 16, 2005, Dr. Doyle reported that the severity of Plaintiff's neck pain was "mild" to "moderate; that Plaintiff had limited ROM; and that the plan for Plaintiff included moist heat and stretching Tr. 430-31.

On August 15, 2005, David Volarich, D.O., conducted an independent medical examination of Plaintiff. Dr. Volarich's report states that Plaintiff said that he had constant throbbing neck pain

which was exacerbated by movement. Dr. Volarich reported that a neurological exam showed that "strength in the shoulders [was] strong to confrontational testing of the deltoid and rotator cuff at 5/5"; that biceps and triceps were strong on the right at 5/5 and "slightly weak on the right at 4.5/5"; that the "pronators and supinators of both forearms were "strong and symmetric at 5/5"; that sensory was "normal to light touch, dull touch, pinprick, and vibratory sense"; and that joint position was "maintained." Dr. Volarich further reported that Plaintiff was able to walk flatfoot across the examination room without footdrop or limp; that he could toe, heel, and tandem walk and stand on either foot without difficulty; that Plaintiff was "reluctant to hop because he [was] afraid that impact [would] cause pain in the neck"; that Plaintiff "squat[ted] fully and [was] able to stand back upright to an erect position without too much difficulty." Dr. Volarich reported that Plaintiff's cervical motion was limited and that Plaintiff's ROM was as follows: flexion was twenty degrees, extension was ten degrees, right lateral flexion was forty degrees, left lateral flexion was thirty five degrees, right rotation was fifty degrees, and left rotation was forty degrees. Dr. Volarich further reported that an upper extremity and joint examination showed that Plaintiff had full motion in each shoulder; that there was "no significant creitus or weakness; that Plaintiff had "full motion bilaterally" at the wrists; that tests for entrapment neuropathy were negative bilaterally; that dexterity of the fingers was intact; and that adduction and opposition of both thumbs was normal.

Dr. Volarich also reported that review of Plaintiff's x-rays showed there was progressive healing of the bony fusion. Dr. Volarich's conclusion was that Plaintiff had "a 65% permanent partial disability of the body as a whole, rated at the cervical spine, due to the disc herniation at C6-7 and protrusion at C5-6." Dr. Volarich further stated a left carpal tunnel syndrome diagnosis in 2003 was erroneous since Plaintiff "has no symptoms consistent with this diagnosis"; that Plaintiff would

require ongoing care for his pain syndrome; that Plaintiff was able to perform "most activities for self-care"; and that Plaintiff was not a candidate for further surgery. Dr. Volarich recommended that Plaintiff undergo vocational evaluation and assessment to find out if and how he might return to the job force. He reported that Plaintiff "may be able to perform some work activities on a limited basis with the following restrictions": he not handle any weight over fifteen to twenty pounds; that he limit handling of this weight to an occasional basis; that he not handle any weight over his head or away from his body; that he not carry weight over long distances or uneven terrain; that he avoid remaining in a fixed position for over thirty to forty-five minutes and rest when needed; that he limit repetitive bending, twisting, lifting, pushing, pulling, carrying, and climbing to an as-needed basis; and that he pursue stretching, strengthening, and range of motion and aerobics conditioning on a daily basis. Tr. 446-57.

In a treatment note dated August 22, 2005, Dr. Doyle stated that Plaintiff was in mild to moderate distress and had limited range of motion. Tr. 428-29.

In a treatment note dated December 14, 2005, Dr. Doyle reported that Plaintiff's complaints included dizziness, seeing spots, "feel[ing] like crap," and feeling shaky. Tr. 423.

On December 19, 2005, Steven Mellies, D.O., conducted an independent medical examination and evaluation of Plaintiff. Dr. Mellies reviewed a May 30, 2003 MRI of Plaintiff's surgical spine which was done prior to Plaintiff having surgery and he noted that it showed disk disease at C5-6. Dr. Mellies reported that a May 20, 2004 post-surgical cervical spine series showed that the foramina appeared to be adequate bilaterally and that there was a good alignment of the spine and that an October 3, 2004 CT scan showed persistent moderate foraminal stenosis on the left. Upon examination Dr. Mellies reported that Plaintiff had good range of motion in both shoulders and arms;

that there was normal strength in both arms and hands; that Plaintiff had good strength of both legs and could ambulate without difficulty; that Plaintiff could squat down to the floor and arise without difficulty; and that a sensory exam showed "no focial loss to pinprick or light touch over the arms or hands, nor did [Plaintiff] have any sensory loss in the legs." Dr. Mellies's impression included "neck pain without evidence of cervical radiculopathy." Dr. Mellies further reported that Plaintiff "would not appear to require any further surgical procedures"; that he did not "detect any focal findings on neurological exam with the exception of decrease in range of motion of his neck"; that Plaintiff did "have subjective findings of pain"; that "overall, it [ ] appeared that [Plaintiff] had no difficulty in doing his own daily activities"; and that Plaintiff "would appear to be able to carry objects at least as much as 10 lbs, probably more like 15 lbs and up to 20 lbs on occasion"; that Plaintiff had good dexterity bilaterally; and that he "could understand why [Plaintiff] would be limited with any moderate to heavy physical activity, but would believe that light physical or repetitive activity would not be out of the question." Tr. 442-43.

In a treatment note dated January 19, 2006, Dr. Doyle reported that Plaintiff was experiencing moderate distress and that Plaintiff was "unable to do past job, but able to work." Tr. 421.

Dr. Doyle reported on July 21, 2006, that Plaintiff had a CT scan on that date and that CT scan showed that there was "evidence of previous ACDF at C5-6 and C6-7 with anterior metal plating and interbody fusion," with no evidence of loosening in the attaching screws; that the C6-7 fusion was well healed; that the C5-6 disc space showed good bony fusion anteriorly; that posterior elements were intact and normally aligned; that the facet joints were within normal limits; that alignment on the cervical segments was normal; that there were no abnormal paraspinal masses, alignment was normal and the anterior metal plate was intact; that the C2-3 and C3-4 levels were

within normal limits; that at C4-5 there was "mild uncinate hypertrophy on the left and mild developmental narrowing of the left neural foramen"; that at C5-6 the metal plate and attaching screws were normal in appearance and there was moderate narrowing of the left neural foramen; that at C6-7 the spinal canal dimensions and right neural foramen were normal, with moderate to severe neural foraminal stenosis on the left; and that at C7-T1 the metal screws and plate were normal in appearance, the spinal canal dimensions were normal, and there was mild uncinate hypertrophy and mild neural foraminal narrowing bilaterally. Tr. 439-40.

In a treatment note dated August 17, 2006, Dr. Doyle reported that Plaintiff was in moderate distress; that there was crepitation; and that Plaintiff had limited range of motion. Tr. 416.

On December 8, 2006, Dr. Doyle reported that Plaintiff was in moderate distress; that he was anxious; that he had limited range of motion; that Plaintiff was oriented; that he Plaintiff's treatment plan included moist heat and stretching; and that Plaintiff had degenerative disc disease. Tr. 413-15.

Dr. Doyle completed a Physical Residual Functional ("RFC") Capacity Questionnaire on December 8, 2006. In the Questionnaire Dr. Doyle reported that Plaintiff's diagnosis includes chronic pain syndrome and constant pain; that Plaintiff's prognosis is fair to poor; that Plaintiff has depression which affects his physical condition; that Plaintiff's impairments are reasonably consistent with the symptoms and functional limitations described in the evaluation; that in a typical workday Plaintiff has pain constantly; that Plaintiff can walk "1 maybe 2" blocks; that Plaintiff can sit thirty minutes at one time; that Plaintiff can stand twenty minutes at one time; that in an 8-hour workday Plaintiff can sit, stand/walk less than two hours; that in an 8-hour workday Plaintiff must walk ten to fifteen minutes for a period of ten minutes; that Plaintiff needs a job that permits shifting positions at will from sitting, standing or walking; that Plaintiff will need to take unscheduled breaks during an 8-hour

-23-

workday; that he will need to take these breaks seven to eight times a day; that when taking a break

Plaintiff will have to rest twenty minutes before returning to work; that Plaintiff does not use an

assistive device while standing/walking; that Plaintiff can occasionally lift and carry ten pounds; that

he can never look down, turn his head to the right or to the left, or look up; that he can frequently

keep his head in a static position; that he can never twist, stoop, crouch, or climb ladders or stairs;

that Plaintiff has significant limitations with reaching, fingering and handling; that in an 8-hour day

Plaintiff is limited to thirty percent in regard to grasping, turning and twisting objects with his hands,

in regard to fine manipulation with his fingers, and with regard to reaching with his arms; that

Plaintiff's impairments are likely to produce "most likely" bad days; that Plaintiff is likely to be absent

from work more than four days a month; that Plaintiff "has never improved from the time of his

surgery"; and that in Dr. Doyle's opinion Plaintiff "will never be able to work again." Tr. 408-412.

## IV.
## LEGAL STANDARD

Plaintiff in the matter under consideration was previously granted disability benefits. This

matter concerns the determination that he is no longer disabled. The Eighth Circuit has articulated

that in such a case:

> The initial critical question in a case such as this is whether the claimant's physical condition has improved since the prior award of disability benefits. The claimant in a disability benefits case has a "continuing burden" to demonstrate that he is disabled, Mathews v. Eldridge, 424 U.S. 319, 336, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), and no inference is to be drawn from the fact that the individual has previously been granted benefits. 42 U.S.C. § 423(f). Once the claimant meets this initial responsibility, however, the burden shifts to the Secretary to demonstrate that the claimant is not disabled. Lewis v. Heckler, 808 F.2d 1293, 1297 (8th Cir.1987). If the Government wishes to cut off benefits due to an improvement in the claimant's medical condition, it must demonstrate that the conditions which previously rendered the claimant disabled have ameliorated, and that the improvement in the physical condition is related to claimant's ability to work. 20 C.F.R. § 404.1594(b)(2)-(5).

Nelson v. Sullivan, 946 F.2d 1314, 1315-16 (8th Cir. 1991).

Termination of benefits is governed by 42 U.S.C. § 423(f), which provides in relevant part that benefits may be discontinued only if (1) there is substantial evidence to support a finding of medical improvement related to an individual's ability to work; and (2) the individual is now able to engage in substantial gainful activity. Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir. 2001); Nelson, 946 F.2d at 1315.

Medical improvement is defined as any decrease in the medical severity of the impairments which were present at the time of the most recent favorable medical decision of disability or continuing disability for social security payment purposes. 20 C.F.R. § 1594(b)(1); Burress v. Apfel, 141 F.3d 875, 879 (8th Cir. 1998). The decision concerning whether or not a claimant's condition has improved is primarily a factual inquiry which often depends on the credibility to be given various witnesses, a responsibility given to the trier of fact. Muncy, 247 F.3d at 733; Nelson, 946 F.2d at 1316.

A determination that there has been a decrease in medical severity must be based on improvements in the symptoms, signs and/or laboratory findings associated with impairments. 20 C.F.R. § 1594(b)(1). The Commissioner is required to compare the prior and current medical evidence to determine if there are any changes in the signs, symptoms, and laboratory findings associated with the impairments. Rice v. Chater, 86 F.3d 1, 2 (1st Cir. 1996) (citing 20 C.F.R. § 1594(b)(7) and (c)(1)). Changed symptoms, signs, and laboratory findings are the only relevant indicia of medical improvement under the regulations. Rice, 86 F.3d at 2. A failure to seek medical treatment from the time of the prior review to the present is not evidence of medical improvement. Id.

Medical improvement is not related to an ability to work if there has been a decrease in the severity of the impairments, but no increase in functional capacity to do basic work activities. 20 C.F.R. § 1594(b)(2). "Basic work activities" is defined as the ability and aptitudes necessary to do most jobs; included in this definition are both exertional abilities and nonexertional abilities. 20 C.F.R. § 1594(b)(4).

Under the Social Security Act, the Commissioner has established a five step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. § § 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities ..." Id. Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual functional capacity

and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § §
404.1520(f).

Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§
416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the
burden of production to produce evidence of other jobs in the national economy that can be
performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets
these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion
to prove disability, however, remains with the claimant." Id. See also Stormo v. Barnhart, 377 F.3d
801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC
remains on the claimant, even when the burden of production shifts to the Commissioner at step
five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production
shifts to the Commissioner at step five to submit evidence of other work in the national economy that
[the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision,
that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d
65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a
reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v.
Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988),
the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the
> evidence and it allows for the possibility of drawing two inconsistent
> conclusions, thus it embodies a zone of choice within which the Secretary may
> decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).      The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 841(8th Cir. 1992); Ricketts v. Sec'y of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990); Jeffery v. Sec'y of Health & Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at

841; Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b-e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-7 (8th Cir. 1982) (en banc). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Id. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Rautio, 862 F.2d at 180; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

# V.

## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. Krogmeier, 294 F.3d at 1022.

Plaintiff contends that the ALJ's decision was not based upon substantial evidence because the ALJ improperly weighed medical opinion evidence; that the ALJ failed to give proper weight to Dr. Doyle's RFC Assessment; that the ALJ failed to find, pursuant to the testimony of the VE, that Plaintiff would not be able to find any jobs in the St. Louis Metropolitan area; and that the ALJ erred in not finding that Plaintiff meets the listed impairment delineated in 20 C.F.R. Appendix 1 to subpart P of Part 404.

## A.     The Medical Opinion Evidence Including the Opinion of Dr. Doyle

Dr. Doyle, who was a treating physician, opined that Plaintiff is unable to work. Plaintiff contends that the ALJ failed to recognize that Dr. Doyle's medical opinion was supported by objective medical findings and that the ALJ failed to give Dr. Doyle's opinion controlling weight. Specifically, Plaintiff contends that there is objective medical evidence which supports Dr. Doyle's medical opinion and that Dr. Doyle's opinion is consistent with several other medical opinions, notably Dr. Coyle and Dr. Volarich.

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted).

The opinions and findings of the plaintiff's treating physician are entitled to considerable weight. Indeed, if they are not controverted by substantial medical or other evidence, they are binding. Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir.1991); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)). However, while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data. Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1985) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8thCir.1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data). Where diagnoses of treating doctors are not supported by medically acceptable clinical and laboratory diagnostic techniques, the court need not accord such diagnoses great weight. Veal v. Bowen, 833 F.2d 693, 699 (7th Cir. 1987). An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). "Medical reports of a treating physician are ordinarily entitled to greater weight than the opinion of a consulting physician." Chamberlain, 47 F.3d at 1494 (citing Matthews, 879 F.2d at 424).

A treating physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Moreover, a brief, conclusory letter from a treating physician stating that the applicant is disabled is not binding on the Secretary. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir.1986) (per curiam) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been

held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature."). See also Chamberlain, 47 F.3d at 1494; Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir.1994) (citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir.1991)); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, diagnostic evidence). On the other hand, a treating physician's observations should not necessarily be treated as conclusory where the doctor had "numerous examinations and hospital visits" with a claimant. See Turpin v. Bowen, 813 F.2d 165, 171 (8th Cir.1987).

Additionally, Social Security Regulation ("SSR") 96-2p states, in its "Explanation of Terms," that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, *2 (S.S.A. July 2, 1996). SSR 96-2p clarifies that 20 C.F.R. § § 404.1527 and 416.927 require that the ALJ provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)." Id. at *5.

When considering the weight to be given the opinion of a treating doctor, the entire record must be evaluated as a whole. Wilson v. Apfel, 172 F.3d 539, 542 (8th Cir. 1999) (quoting Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996) ("Although a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole.").

The ALJ considered that Plaintiff had surgery in July 2003 and again in April 2004 and that in June 2004 Plaintiff was awarded a Period of Disability and Disability Insurance Benefits. After considering the evidence of record, the ALJ found that Plaintiff had experienced medical improvement and was no longer disabled. Upon doing so the ALJ considered Plaintiff's medical history, including the records of Dr. Coyle, Dr. Doyle, Dr. Graham, and Dr. Cantrell, all of whom were Plaintiff's treating doctors. The ALJ also considered the records of Dr. Volarich and Dr. Millies, consulting doctors who examined Plaintiff. The ALJ considered these medical records in detail. Plaintiff contends that the ALJ did not mention the July 21, 2006 CT of the cervical spine which Dr. Doyle reviewed. An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. See Moore ex rel. Moore v. Barnhart, 413 F.3d718, 721 n.3 (8th Cir. 2005) ("The fact that the ALJ's decision does not specifically mention the [particular listing] does not affect our review."); Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (holding that an ALJ is not required to discuss every piece of evidence submitted and that an "ALJ's failure to cite specific evidence does not indicate that such evidence was not considered"); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995). Indeed, failure to cite specific evidence does not require reversal as the critical issue is whether the record supports the ALJ's overall conclusion. Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003).

Moreover, Dr. Doyle reported that the July 2006 CT scan showed *no evidence of loosening of the screws* placed during Plaintiff's surgery; that Plaintiff's fusion was *"well healed"*; that there was *good bony fusion* anteriorly; that posterior elements were *intact* and *normally aligned*; that facet joints were within *normal* limits; that alignment of the cervical segments was *normal*; and that at C5-6 and at C7-T1 the metal plate and attaching screws were *normal* in appearance. The abnormalities

reported by Dr. Doyle in regard to the July 2006 CT scan were that at C4-5 there was *mild* uncinate hypertrophpy on the left and *mild* developmental narrowing on the left neural foramen, at C6-7 there was *moderate* narrowing of the left neural foraminal stenosis on the left, and at C7-T1 there was *mild* uncinate hypertrophy and *mild* neural foraminal narrowing bilaterally. Furthermore, in January, August, and December 2006 Dr. Doyle reported that Plaintiff was in *moderate* distress and in January 2005 and May 2005 Dr. Doyle reported that Plaintiff was in *mild to moderate* distress.

Dr. Doyle stated in the December 2006 RFC Assessment, among other things, that Plaintiff was in pain constantly; that he lift less than ten pounds occasionally; that Plaintiff would have to take breaks of twenty minutes seven to eight times a day; that Plaintiff can never turn his head, twist, stoop, or climb; and that Plaintiff has significant limitations with reaching, fingering and handling. These conclusions of Dr. Doyle are inconsistent with the July 2006 CT scan report which Dr. Doyle prepared as well as his other records in which Dr. Doyle described Plaintiff's abnormalities only as mild and/or moderate. Thus, because Dr. Doyle's RFC Assessment is inconsistent with both his treatment notes and test results, his conclusion that Plaintiff cannot engage in any work should not be given controlling weight. See Chamberlain, 222 F.3d at 502; Kelley, 133 F.3d at 589.

Further, in regard to Dr. Doyle's stating in the December 2006 RFC Assessment that Plaintiff would never be able to work again, Dr. Doyle reported in January 2006 Plaintiff would be able to do work other than his previous work. This statement directly contradicts Dr. Doyle's statement in the RFC Assessment that Plaintiff will never be able to work again. See Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir.2000) (holding that an ALJ may discount a treating physician's opinion where the physician has offered inconsistent opinions). In any case, whether there is work which Plaintiff can perform is an issue reserved for the Commissioner and not for Dr. Doyle to decide. See Ellis, 392

F.3d at 994. As noted by the ALJ, little weight is afforded a physician's opinion where it is comprised largely of conclusory statements. See Chamberlain, 47 F.3d at 436. Thus, the ALJ properly discredited Dr. Doyle's RFC Assessment.

Upon discrediting Dr. Doyle, the ALJ considered that Dr. Doyle's opinion as to Plaintiff's functional limitations "are simply recitations of [Plaintiff's] testimony and allegations." Tr. 15. As such, Dr. Doyle's opinion was properly discounted by the ALJ. See Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) ("[T]he ALJ acted properly in disregarding those portions of [a physician's] report that were based on [the claimant's] subjective descriptions to him of her pain levels.").

Upon discrediting the conclusion of Dr. Doyle, the ALJ considered the opinion of Dr. Mellies. Dr. Mellies reported that his independent medical examination and evaluation of Plaintiff showed that Plaintiff had *good range of motion* in the shoulders and arms, *normal strength* in the arms and hands, *good strength* in the legs, could *ambulate without difficulty*, could squat to the floor and arise without difficulty, that Plaintiff had a decreased ROM in the neck, that Plaintiff could *carry up to twenty pounds occasionally*, and that he could *engage in light physical and repetitive activity*. Upon reaching this conclusion, Dr. Mellies, not only relied on his physical examination of Plaintiff but relied upon test results including Plaintiff's May 2003 MRI, his May 2004 spine series, and his October 2004 CT scan.

Upon discrediting the opinion of Dr. Doyle, the ALJ also considered the opinion of Dr. Volarich. Dr. Volarich conducted an independent medical examination of Plaintiff in August 2005. Although Dr. Volarich reported that Plaintiff had restricted ROM, he reported that examination of Plaintiff showed that Plaintiff's biceps and triceps were *slightly* week on the right side, at 4.5/5; that Plaintiff could *walk and stand without difficulty*; that Plaintiff had *full motion in his shoulders* and

-35-

bilaterally *in his wrists*; and that his *finger dexterity* was *intact*.  Not only did Dr. Volarich examine Plaintiff, but he reviewed test results including x-rays.  Dr. Volarich determined that Plaintiff can perform some work activities with the restrictions of not handling weight over fifteen to twenty pounds more than on an occasional basis and recommended that Plaintiff have restrictions in regard to lifting weight above his head or away from his body, carrying weight over long distances, remaining in one position for over thirty to forty-five minutes, and limiting repetitive bending, twisting, lifting, pushing, pulling and other activities.

The ALJ also considered the opinion of Dr. Cantrell, a pain management specialist, who saw Plaintiff on several instances from September 2004 through January 2005.  Dr. Cantrell reported in September 2004, that although Plaintiff was to remain on lifting restrictions, he wanted clarification as to whether the avoidance of twisting and turning the head was a *self-imposed restriction*. Plaintiff then had a CT scan in October 2004 at Dr. Cantrell's recommendation. Other than evidence of Plaintiff's surgeries, the CT scan showed normal vertebral alignment, degenerative changes commensurate with age, and minimal left-sided neural foraminal changes.  Further, Dr. Cantrell reported that an EMG conducted in October 2004 showed no evidence of acute or chronic cervical radiculopathy or brachial plexopathy.  In January 2005, after Plaintiff had participated in work hardening, Dr. Cantrell reported that Plaintiff said he would lift 100 pounds with one hand over his head; that Plaintiff potentially over-guarded his neck suggesting a perceived disability; and that Plaintiff could return to work with a lifting restriction of less than thirty five pounds and avoidance of repetitive overhead activities.  Indeed, Dr. Cantrell released Plaintiff from care in January 2005.

Significantly, a January 2005 report from Plaintiff's work hardening states that after five sessions Plaintiff could lift thirty pounds from the floor to his waist and from his waist to his shoulder;

that Plaintiff could carry twenty pounds; that he was unrestricted in his ability to sit, stand, walk, bend, and squat; that he could occasionally reach and climb; and that Plaintiff had improved grip and cervical ROM. The work hardening report further states that Plaintiff passed only two out of six Symptom Magnification Indicators. In that regard, the report noted that Plaintiff drove despite alleging that his pain was 9/10; that there was little change in functional ability; that fifteen minutes into the session Plaintiff's neck flexion was reduced to the neutral position; that despite his allegation of 9/10, Plaintiff did not need a break during testing; that Plaintiff engaged in inappropriate laughter; and that Plaintiff performed tasks with a constant pace.

The ALJ also considered that an emergency room record reflects that it was arranged for Plaintiff to see a neurologist, but that the record does not reflect that Plaintiff saw the neurologist. See Eichelberger, 390 F.3d at 589 (holding that the ALJ properly considered that the plaintiff cancelled several physical therapy appointments and that no physician imposed any work-related restrictions on her).

The ALJ additionally considered that Dr. Doyle only began to treat Plaintiff after other specialists would no longer "see [Plaintiff] to prescribe narcotic pain medication" and that Dr. Doyle had the least information and was in the poorest position to accurately analyze Plaintiff's allegations. Tr. 15. Indeed, Plaintiff only saw Dr. Doyle after Dr. Coyle, Plaintiff's surgeon, advised in January 2005 that Plaintiff was being released from treatment and that Plaintiff could return to work with a lifting restriction.

The ALJ properly resolved conflicts among Plaintiff's various treating and examining physicians upon determining Plaintiff's limitations. See Estes, 275 F.3d at 725. Because Dr. Doyle's opinion evidence is controverted by other substantial evidence and is not supported by objective

medical evidence, including Dr. Doyle's own records, the ALJ properly discounted Dr. Doyle's

opinion that Plaintiff is unable to work. See Prosch, 201 F.3d at 1013; Chamberlain, 47 F.3d at 1494;

Barrett, 38 F.3d at 1023; King, 742 F.2d at 973. The ALJ articulated his reasons for not giving Dr.

Doyle's opinion controlling weight. See 1996 WL 374188 at *2.

For the reasons articulated above, the court finds that the ALJ's decision in this regard is

based on substantial evidence and that the ALJ gave proper weight to Dr. Doyle's findings. Only

after considering the medical records in evidence did the ALJ find that Plaintiff is limited to carrying

ten pounds frequently and twenty pounds occasionally, standing and walking at least six hours in an

8-hour workday, and sitting at least six hours in an 8-hour workday. The ALJ further found that

Plaintiff cannot engage in any repetitive overhead lifting and must avoid concentrated exposure to

vibration of the body. The court finds that this finding of the ALJ of Plaintiff's RFC is based on

substantial evidence on the record as a whole.[3]

## B.    Listing of Impairments

Plaintiff contends that he meets Listing 1.04 A. 20 CFR Appendix 1 to Subpart P of Part 404,

entitled Listing of Impairments (Listings), 1.04 A, reads:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal
> stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture),
> resulting in compromise of a nerve root (including the cauda equina) or the spinal

---

[3]    Consistent with the Regulations and case law, the ALJ compared Plaintiff's current
restrictions with those he had at the time he had previously been found disabled in June 2004. See
Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir. 2001); Nelson v. Sullivan, 946 F.2d 1314, 1315
(8th Cir. 1991). The ALJ concluded that Plaintiff had medical improvement relating to his ability
to perform work, and therefore, considered the severity of Plaintiff's current impairments and
whether these impairments preclude the performance of substantial gainful activity. See 20 C.F.R.
§ 1594(b)(1); Burress v. Apfel, 141 F.3d 875, 879 (8th Cir. 1998).

cord.

With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)

Specifically, Plaintiff argues that the CT of the cervical spine conducted on July 21, 2006, confirmed impairments that satisfy the criteria of Listing 1.04 and that Dr. Doyle's treatment notes satisfy the requirements of subpart A of the Listings. Plaintiff contends that because the ALJ erred at step three of the process and failed to recognize that Plaintiff meets or equals this impairment in the Listings, the ALJ's decision should be reversed and the Plaintiff should be declared per se disabled under the Regulations.

The ALJ found that there had been a decrease in the medical severity of Plaintiff's impairments since June 9, 2004, the date of the most recent decision finding that Plaintiff disabled and found that Plaintiff did not meet, or equal in severity, the appropriate Listing. As discussed above, the ALJ considered the opinions of treating, examining and consulting physicians and found that Plaintiff was able to engage in substantial gainful activity.

In regard to Plaintiff's claim that Dr. Doyle's records establish that Plaintiff meets the criteria of Listing 1.04 A for disorders of the spine and that, therefore, the ALJ erred in not finding that Plaintiff was disabled at Step 3 of the sequential analysis, the court has found above that the ALJ properly discounted Dr. Doyle's conclusion that Plaintiff cannot engage in any work activity and that the ALJ's decision in this regard is supported by substantial evidence on the record.

In particular, upon concluding that Plaintiff does not meet or equal a Listing, the ALJ

considered that Dr. Cantrell, Dr. Coyle, and Dr. Graham questioned the veracity of Plaintiff's allegations of pain and that Plaintiff failed multiple portions of a functional evaluation which measured symptom magnification. See Guilliams v. Barnhart, 393 F.3d 798, 801-03 (8th Cir.2005) (holding that an ALJ cited good reason for discrediting a claimant's complaint of pain where the ALJ relied, in part, on a physician's note suggesting the claimant magnified his symptoms). The ALJ further considered that Plaintiff's allegations were wholly inconsistent with the objective medical evidence. See Ramirez v. Barnhart, 292 F.3d 576 (8th Cir. 2002) (holding that while an ALJ may not disregard subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence) (citing 20 C.F.R. § § 416.908, 416.929). Also, as stated above, the ALJ considered Plaintiff's noncompliance. See Brown, 87 F.3d at 965. The court finds that the ALJ properly considered these factors and that his decision in this regard is supported by substantial evidence. The court further finds that the ALJ's finding that Plaintiff's medical impairments do not meet or equal in severity the appropriate medical finding contained in the Listing of Impairments is supported by substantial evidence.

**C.     Testimony of the Vocational Expert:**

Plaintiff contends that the ALJ failed to follow the finding of the VE that there is no work available for a person with Plaintiff's RFC to perform.

Resort to the Medical-Vocational Guidelines is only appropriate when there are no nonexertional impairments that substantially limit the ability of Plaintiff to perform substantially gainful activity. Indeed, once a determination is made that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the economy that the claimant

can perform. <u>Robinson v. Sullivan</u>, 956 F.2d 836, 839 (8th Cir. 1992). <u>See</u> <u>also</u> <u>Reynolds v. Chater</u>, 82 F.3d 254, 258 (8th Cir. 1996) (holding that when complaints of pain are explicitly discredited by legally sufficient reasons, Guidelines may be used). If the claimant is found to have only exertional impairments, the Commissioner may meet this burden by referring to the Medical Vocational Guidelines. <u>See</u> <u>Robinson</u>, 956 F.2d at 839. If, however, the claimant is also found to have nonexertional impairments that diminish the claimant's capacity to perform the full range of jobs listed in the Guidelines, the Commissioner must solicit testimony from a vocational expert to establish that there are jobs in the national economy that the claimant can perform. <u>See</u> <u>id.</u> On the other hand, "'an ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines.'" <u>Lucy v. Chater</u>, 113 F.3d 905, 908 (8th Cir. 1997) (quoting <u>Thompson v. Bowen</u>, 850 F.2d 346, 349-50 (8th Cir. 1988)).

SSR 83-10, 1983 WL 31251, at *1, clarifies the proper use of the Guidelines in the sequential analysis for determining whether a claimant is disabled and states in relevant part:

> [T]he fifth and last step in the process, the individual's residual functional capacity (RFC) in conjunction with his or her age, education, and work experience, are considered to determine whether the individual can engage in any other substantial gainful work which exists in the national economy. (See the glossary at the end of the policy statement for definitions of terms and concepts commonly used in medical-vocational evaluation--e.g., RFC.)

SSR 83-10, 1983 WL 31251, at *6, defines a nonexertional impairment as "[a]ny impairment which does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance,

stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for activities." SSR 83-10, 1983 WL 31251, at *7, defines nonexertional limitation as "[a]n impairment-caused limitation of function which directly affects capability to perform work activities other than the primary strength activities." SSR 83-10, 1983 WL 31251, at * 7, defines nonexertional restriction as an "impairment-caused need to avoid one or more environmental conditions in a workplace."

The Eighth Circuit has explained the circumstances when a claimant has nonexertional limitations but the ALJ need not resort to the testimony of a VE. The court held in Sanders v. Sullivan, 983 F.2d 822, 823 (8th Cir. 1992), that:

> "[A]n ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." Thompson v. Bowen, 850 F.2d 346, 349-50 (8th Cir.1988). However, if the claimant's nonexertional impairments diminish his or her residual functional capacity to perform the full range of activities listed in the Guidelines, the Secretary must produce expert vocational testimony or other similar evidence to establish that there are jobs available in the national economy for a person with the claimant's characteristics. Id. at 349.

See also Harris v. Shalala, 45 F.3d 1190, 1194 (8th Cir.1995); Reed v. Sullivan, 988 F.2d 812, 816 (8th Cir. 1993) ("[T]he ALJ may rely on the guidelines to direct a conclusion of either disabled or not disabled without resorting to vocational expert testimony if the ALJ determines that a claimant's nonexertional limitations do not *significantly* affect the claimant's RFC.") (emphasis added) (citing Thompson v. Bowen, 850 F.2d 346, 349 (8th Cir. 1988)).

Additionally, an ALJ posing a hypothetical to a VE is not required to include all of a claimant's limitations, but only those which he finds credible. Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999) ("In posing hypothetical questions to a vocational expert, an ALJ must include all impairments he finds supported by the administrative record."); Sobania v. Sec'y of Health & Human

Servs., 879 F.2d 441, 445 (8th Cir. 1989); Rautio, 862 F.2d at 180. The hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005) ("'Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question.'") (quoting Tucker v. Barnhart, 363 F.3d 781, 784 (8th Cir.2004)); Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence); Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Sobania, 879 F.2d at 445; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Where a hypothetical question precisely sets forth all of the claimant's physical and mental impairments, a vocational expert's testimony constitutes substantial evidence supporting the ALJ's decision. Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a VE's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations); Jones v. Chater, 72 F.3d 81, 82 (8th Cir. 1995) (holding that Where an ALJ's hypotheticals included all of a claimant's impairments as supported by the record, and the expert limited his opinion in this regard, an ALJ properly relies on the vocational expert's testimony); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990).

The court has found above that the ALJ's determination of Plaintiff's RFC is supported by substantial evidence. After determining Plaintiff's RFC the ALJ found that Plaintiff's limitations do preclude his performing his past relevant work as a welder or laborer but that his limitations do not preclude the full range of sedentary work under the Guidelines. In his RFC finding the ALJ did not include any nonexertional limitations. In particular, the ALJ found that Plaintiff did not demonstrate that his alleged depression, medication side effects, and sleeping difficulty have more than a minimal

effect on his ability to perform mental work-related activities. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) ("Because the ALJ's determination that [the claimant] had a non-severe mental impairment was supported by substantial evidence, it was appropriate for the ALJ to rely upon the [Grids] to reach the conclusion that [the claimant] was not disabled."). As such, the ALJ was not required to consult a VE. See Harris, 45 F.3d at 1194; Sanders, 983 F.2d at 823; Reed, 988 F.2d at 816. As required by, and consistent with, SSR 83-10 at *1, the ALJ considered Plaintiff's age, education, past relevant work experience, and RFC, and relying on the Guidelines, found that there are jobs which Plaintiff can perform.

Further, although he was not required to consult with a VE, the ALJ did obtain the testimony of a VE. Consistent with the Regulations and case law, the ALJ posed a hypothetical to the VE which included those limitations which the ALJ found credible. See Haggard, 175 F.3d at 595; Hunt, 250 F.3d at 625; Sobana, 879 F.2d at 445; Roberts, 783 F.2d at 112. As such, the VE's opinion is substantial evidence to support the ALJ's conclusion that there is work in the economy which Plaintiff can perform and that, therefore, he is not disabled. See Robson, 526 F.3d at 392; Grissom, 416 F.3d at 836; Wingert, 894 F.2d at 298.


## VI.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is no longer disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff Stephen G. Statler in his Brief in Support of Complaint is **DENIED;** Doc. 15

**IT IS FINALLY ORDERED** that a separate Judgement shall be entered in favor of Defendant and against Plaintiff in the instant cause of action and incorporating this Memorandum and Order.

/s/Mary Ann L. Medler

MARY ANN L. MEDLER

UNITED STATES MAGISTRATE JUDGE

Dated this <u>27th</u> day of January, 2009.